1  **FITZGERALD MONROE FLYNN PC**
2  JACK FITZGERALD (SBN 257370)
   *jfitzgerald@fmfpc.com*
3  MELANIE R. MONROE (SBN 275423)
   *mmonroe@fmfpc.com*
4  TREVOR M. FLYNN (SBN 253362)
   *tflynn@fmfpc.com*
5  CAROLINE S. EMHARDT (SBN 321222)
   *cemhardt@fmfpc.com*
6
7  2341 Jefferson Street, Suite 200
   San Diego, California 92110
8  Phone: (619) 215-1741
9  ***Class Counsel***

10

11

12                **UNITED STATES DISTRICT COURT**
13              **SOUTHERN DISTRICT OF CALIFORNIA**

14

15 | EVLYN ANDRADE-HEYMSFIELD, on behalf of herself, all others similarly situated, and the general public, | Case No. 21-cv-1446-BTM-MSB |

EVLYN ANDRADE-HEYMSFIELD, on
behalf of herself, all others similarly
situated, and the general public,

      Plaintiff,

      v.

NEXTFOODS, INC.,

      Defendant.

Case No. 21-cv-1446-BTM-MSB

**SUPPLEMENTAL DECLARATION OF JACK FITZGERALD IN SUPPORT OF PLAINTIFF'S MOTION FOR ATTORNEYS' FEES, COSTS, AND SERVICE AWARDS**

Judge:    Hon. Barry Ted Moskowitz

I, Jack Fitzgerald, declare:

1.    I am a member in good standing of the State Bars of California and New York; of the United States District Courts for the Northern, Central and Southern Districts of California, the Southern and Eastern Districts of New York, and the Western District of Wisconsin; and of the United States Courts of Appeal for the Second, Eighth, and Ninth Circuits. I make this declaration based on my own personal knowledge, in support of Plaintiff's Motion for Attorneys' Fees, Costs, and Service Awards.

**Introduction**

2.    During the March 11, 2024 Final Approval hearing, the Court requested additional information—specifically, survey data—supporting Class Counsels' requested rates, which are as follows. *See* Dkt. No. 57-1, Declaration of Jack Fitzgerald in Support of Motion for Attorneys' Fees, Costs, and Service Awards ("Fitzgerald Fee Decl.") ¶ 7.

| Timekeeper | Law School Graduation | Experience | Position | Rate |
|---|---|---|---|---|
| Jack Fitzgerald | 2004 | 19.5 years | Principal | $885 |
| Paul Joseph | 2012 | 11.5 years | Principal[1] | $730 |
| Melanie (Persinger) Monroe | 2010 | 13.5 years | Partner | $695 |
| Trevor Flynn | 2007 | 16.5 years | Partner[2] | $680 |
| Caroline Emhardt | 2017 | 6.5 years | Associate | $560 |
| Christina Mendez | - | - | Paralegal | $240 |

3.    My previous declaration gave evidence these rates were supported by three previous fee awards during the last four years by other courts in this district, as well as fee awards by courts in this district setting rates for other attorneys in three similar cases. *See* Fitzgerald Fee Decl. ¶¶ 9-16; *cf. Blum v. Stenson*, 465 U.S. 886, 895 & n.11 (1984) (reasonableness of hourly rate determined by prevailing market rates in the community in

---

[1] Through December 31, 2023, Mr. Joseph was one of the two principals of Fitzgerald Joseph LLP, the predecessor of Fitzgerald Monroe Flynn PC. *See generally* Dkt. No. 58.

[2] Mr. Flynn became a named partner in February 2024.

which the court sits, for similar litigation by attorneys of comparable experience, skill, and reputation); *United Steelworks of Am. v. Phelps Dodge Corp.*, 896 F.2d 403, 407 (9th Cir. 1990) ("rate determinations in other cases, particularly those setting a rate for the plaintiffs' attorney, are satisfactory evidence of the prevailing market rate").

4.    There is an additional decision from this district supporting my rate and Mr. Flynn's: *Loomis v. Slendertone Distrib.*, 2021 U.S. Dist. LEXIS 44047, at *26-28 (S.D. Cal. Mar. 8, 2021) (approving rate of $750 for me and $575 for Mr. Flynn).

5.    My declaration noted—based on four fee awards made by judges in this district in 2020, 2022, and 2023—that our "present rates represent a modest increase of approximately 22.7% on average over [our] 2020 rates (or 5.7% per year), 7.3% on average over [our] 2022 rates (or 3.7% per year), and 2.0% on average over [our] 2023 rates, to account for the fact that 'hourly attorney fee rates generally increase over time with inflation,' *Tehachapi Unified Sch. Dist. v. K.M. by & Through Markham*, 2019 WL 331153, at *6 (E.D. Cal. Jan. 25, 2019)." Fitzgerald Fee Decl. ¶ 12.

6.    A recent publication by Thomson Reuters Institute, titled "2024 Report on the State of the US Legal Market," a true and correct copy of which is attached hereto as Exhibit 1, further demonstrates the reasonableness of these increases in Class Counsel's rates. According to the report:

> Law firm rates continued to rise sharply in 2023, reflecting a trend that has been ongoing for more than a decade, although sharply accelerating since 2019.

> Worked rates, the negotiated rates clients agree to pay to law firms for particular matters, have risen at a relatively dramatic pace over the past five years. The past two years, in particular, have seen the pace of worked rate growth begin to rival figures from before the [Global Financial Crisis] of the late-2000s.

> In 2022, the market saw a rare phenomenon as worked rate growth was actually eclipsed by the growth in inflation, an occurrence never before seen in our data. In response, many law firms pursued aggressive rate growth strategies in 2023, leading all three major law firm segments to post worked rate growth averages not seen since 2008.

Ex. 1 at 11. This reporting included the below graphic showing that year-over-year rates increased 6% on average as of November 2023.



**Survey Data**

7.      The reasonableness of our rates in this case is also supported by survey data of other San Diego attorneys with a reputation for excellent skill practicing complex litigation. *Compare Obesity Research Inst., LLC v. Fiber Research Int'l, LLC*, 2016 WL 1573319, at *2-3 (S.D. Cal. Apr. 18, 2016) (finding reasonable proposed but disputed rates for me and Melanie (Persinger) Monroe in Lanham Act case and discussing support).

8.      I previously provided a firm resume outlining the experience of the firm and its attorneys. Dkt. No. 53-5. In my opinion, our firm has such a reputation for excellence in the community, including among the judges of the Southern District of California. In *McMorrow v. Mondelez Int'l, Inc.*, for example, the Honorable Cynthia Bashant wrote:

> Despite the risks faced by the class—including substantial unfavorable authority—Class Counsel managed to secure an $8,000,000 settlement and injunctive relief. Class Counsel's experience in consumer fraud class actions enabled them to evaluate the strengths and weaknesses of the case against Defendant and the reasonableness of the settlement. . . . Plaintiffs argue that "great skill was required by Class Counsel here, given the challenging theory, procedural hurdles, technical subject matter requiring expert testimony, and expertise of Mondelez's attorneys, who had firsthand experience defending against similar claims." This Court tends to agree. Counsel navigated substantial offensive, defensive, and expert discovery; briefed class certification multiple times and ultimately prevailed; and engaged in a successful mediation to resolve the case.

2022 WL 1056098, at *7 (S.D. Cal. Apr. 8, 2022) (internal record citations omitted); *see also Testone v. Barlean's Organic Oils, LLC*, 2023 WL 2375246, at *6 (S.D. Cal. Mar. 6, 2023) (Montenegro, J.) ("Despite the risks faced by the Class—including the challenging theory alleged in Plaintiffs' complaint, class action procedural hurdles, and a technical subject matter necessitating expert testimony—Class Counsel managed to secure a favorable settlement for the Class, including significant monetary and injunctive relief.").

9.     Similarly, during a March 8, 2021 Final Approval hearing, the Honorable Michael M. Anello stated, "Mr. Fitzgerald and the entire firm, including Mr. Flynn, are well-known and respected in the class action litigation field, and they did their usual excellent job here." Dkt. No. 53-4, Hrg. Tr. at 5:3-5.

10.     Despite being small, our firm has, since 2018, secured over $50 million in non-reversionary common fund settlements based on the same theory at issue here: the use of health and wellness claims on sugary cereals. Before getting there, we obtained class certification in numerous cases, including in contested motions against Kellogg, Post, and Mondelez International; beat multiple motions for summary judgment; and in one case even obtained from the Honorable Lucy H. Koh summary judgment *against* Kellogg, establishing its *classwide* liability for misbranding. *See Hadley v. Kellogg Sales Co.*, 2019 WL 3804661, at *17-24 (N.D. Cal. 2019). Notably, defense counsel in *Hadley* was Hon. Kenneth K. Lee, presently a judge on the Ninth Circuit (as is Judge Koh).

11.     While our firm has enjoyed a great deal of success in the area of food false advertising, however, it is not one-dimensional. For example, ours was the first firm to file cases against Silvergate Bank and Signature Bank for their involvement in the FTX fraud, and successfully argued to separate those cases—which are ongoing—from the massive FTX MDL in Florida. *See In re: Silvergate Capital Corp.*, No. 3:23-cv-01406-RBM-BLM (S.D. Cal.); *Statistica Capital Ltd. v. FDIC as Receiver for Signature Bank et al.*, No. 1:23-cv-993-ALC (S.D.N.Y.). In *Statistica*, we represent not consumers, but an interntional trading firm. We also currently represent a group of domestic beekeepers—including the largest one in the United States—in an antitrust and RICO action against an industry group

our clients allege is fixing prices by adulterating honey and certifying it as genuine. *See Henry's Bullfrog Bees et al. v. Sunland Trading, Inc. et al.*, No. 2:21-cv-582-DJC-CKD (E.D. Cal.). And we recently filed a privacy action against Tesla, which is now in arbitration. *See Yeh v. Tesla, Inc.*, No. 3:23-cv-017040-JCS (N.D. Cal.). We also occasionally do high-level non-class action civil litigation. In *Obesity Research v. Fiber Research Inst., LLC*, for example, we obtained summary judgment on behalf of our client, Fiber Research, in a Lanham Act case. 310 F. Supp. 3d 1089 (S.D. Cal. 2018).

12.    In sum, our services are sought out, not just by consumers, but also by sophisticated businesses and other entities. And because we have enjoyed a number of noteworthy successes in the representation of our clients over many years, I believe we have earned an excellent reputation in the community, both among our peers in the bar, and with the judges in this and other courts throughout California and the country.

13.    Attached hereto as <u>Exhibit 2</u> is a true and correct copy of the National Law Journal's 2015 Billing Report, which reflects partner rates in California of between $200 and $1,080 per hour, with a median of $495 per hour; and associate rates of between $300 and $950 per hour, with a median of $350 per hour.

14.    Applying the all-segments inflation rates from the Thomson Reuters data from 2016 to 2023 to these hourly rates yields the following median partner and associate rates for 2023—presumably, the rates would be another 4% or so higher in 2024.

| Year | Inflation Rate | Partner Low | Partner Median | Partner High | Associate Low | Associate Median | Associate High |
|------|------|------|------|------|------|------|------|
| 2015 | - | $200 | $495 | $1,080 | $300 | $350 | $950 |
| 2016 | 3.0% | $206 | $510 | $1,112 | $309 | $361 | $979 |
| 2017 | 3.1% | $212 | $526 | $1,146 | $319 | $372 | $1,009 |
| 2018 | 3.2% | $219 | $543 | $1,183 | $329 | $384 | $1,041 |
| 2019 | 3.8% | $227 | $564 | $1,228 | $342 | $399 | $1,081 |
| 2020 | 5.0% | $238 | $592 | $1,289 | $359 | $419 | $1,135 |
| 2021 | 4.0% | $248 | $616 | $1,341 | $373 | $436 | $1,180 |
| 2022 | 4.8% | $260 | $646 | $1,405 | $391 | $457 | $1,237 |
| 2023 | 6.0% | $276 | $685 | $1,489 | $414 | $484 | $1,311 |

15.    Given that (i) $685 is a reasonable *median* partner rate for California attorneys, (ii) San Diego is one of the most expensive legal markets in the state, and (iii) class action litigation is among the most complex, necessitating significant skill, I believe Class Counsel's Partner rates of between $680 and $885—representing between 99% and 128% of the reasonable median partner rate, and between just 46% and 59% of the reasonable high partner rate using survey and inflation data—are entirely reasonable. *Compare Figueroa v. Capital One, N.A.*, 2021 WL 211551, at *11 (S.D. Cal. Jan. 21, 2021) (Stating in 2021 that "Partner rates for $750 and associate rates of $450 have been accepted in other class action cases by this court and other district courts in class action litigation in this community."); *Youngevity Int'l, Corp. v. Smith*, 2018 WL 2113238, at *5 (S.D. Cal. May 7, 2018) (noting that, more than a decade ago, the "2013 National Law Journal survey . . . indicate[d] the average billing rate for partners in San Diego was $500 per hour" (citation omitted)). Similarly, Caroline Emhardt's rate of $560 is just 15% above the median associate rate, and just 43% of the associate high rate using this analysis.[3]

16.    Attached hereto as <u>Exhibit 3</u> is a true and correct copy of excerpts from a report titled United States Consumer Law Attorney Fee Survey Report 2017-2018, which shows that 6-7 years ago, the median hourly rate for class action attorneys in San Diego was $500. Applying the Thompson Reuters' inflation data shows an average hourly rate last year of $630.

| Year | Inflation Rate | San Diego Class Action Attorney Median Rate |
|------|----------------|---------------------------------------------|
| 2018 | - | $500 |
| 2019 | 3.8% | $519 |
| 2020 | 5.0% | $545 |
| 2021 | 4.0% | $567 |
| 2022 | 4.8% | $594 |
| 2023 | 6.0% | $630 |

---

[3] Notably, the base median associate rate in the NLJ survey, $350, was quite close to the lowest rate, $300, and quite far away from the highest rate, $950, indicating the data was heavily skewed by *young* associates. Accordingly, it is sensible that a more experienced associate, like Ms. Emhardt, would fall above the median rate.

That has likely increased again approximately 4% to $655. Accordingly, our rates of between $560 and $885 (with an average rate across five attorneys of $758) fall within range of the median and are supported by the data.

17.    Relying on survey evidence, *four years ago* the Honorable Jeffrey T. Miller found the following rates reasonable for a well-regarded San Diego class action firm, further supporting the reasonableness—indeed conservativeness—of our rates today:

> • Partners: $900, $875, $875, $725, and $600 per hour;
>
> • Associate: $500 per hour; and
>
> • Paralegals: $200, $175 per hour.

*Lopez v. Mgmt. & Training Corp.*, 2020 WL 1911571, at *8 (S.D. Cal. Apr. 20, 2020) (rates for Cohelan Khoury & Singer); *see also Toranto v. Jaffurs*, 2019 WL 1317726, at *3 (S.D. Cal. Mar. 22, 2019) (five years ago, collecting cases and finding rate of $700 per hour for partners and $430 per hour for associates reasonable).

**Additional Information Supporting Class Counsel's Rates**

18.    In November 2022, Winston & Strawn LLP made a fee application in an employment class action involving women's soccer, a true and correct copy of which is attached hereto as <u>Exhibit 4</u>. This was notable because Winston & Strawn is a large defense firm and its foray into plaintiffs'-side class action work was unusual, giving insight into the rates charged by attorneys typically on the other side of the bar.

19.    For the 2022 calendar year, Winston & Strawn's rates were as follows.

| Timekeeper | Law School Graduation | Experience | Position | Rate |
|---|---|---|---|---|
| Jeffrey Kessler | 1977 | 46.5 years | Partner | $1,795 |
| David Feher | 1984 | 39.5 years | Partner | $1,415 |
| Ruth Wimer | 1980 | 43.5 years | Partner | $1,285 |
| Amy Gordon | 1991 | 32.5 years | Partner | $1,225 |
| Diana Leiden | 2009 | 14.5 years | Partner | $1,080 |
| Jennifer Parsigian | 2012 | 11.5 years | Partner | $1,060 |
| Matthew DalSanto | 2011 | 12.5 years | Of Counsel | $1,050 |

7

| Timekeeper | Law School Graduation | Experience | Position | Rate |
|---|---|---|---|---|
| Cardelle Spangler | 1997 | 26.5 years | Partner | $995 |
| Lev Tsukerman | 2017 | 6.5 years | Associate | $875 |
| Scott Sherman | 2017 | 6.5 years | Associate | $875 |
| Kerrie Edmondson | 2018 | 5.5 years | Associate | $810 |
| Marjon Momand | 2019 | 4.5 years | Associate | $725 |
| Corinne Kyritsopoulos | - | - | Paralegal | $340 |

20. Particularly noteworthy:

a. My rate of $885 is approximately 80% of the rate of Ms. Leiden and Ms. Parsigian, who have 5 and 8 years less experience than me—and it is just $5 more than the rate of two associates, Mssrs. Tsukerman and Sherman, each with 13 years' less experience than me;

b. Mr. Joseph's rate of $730 is less than 70% of Ms. Parsigian's rate, although they have the same amount of experience;

c. Ms. (Persinger) Monroe's rate of $695, and Mr. Flynn's rate of $680, are both less than Winston & Strawn's most junior associate (Ms. Momand, at a $725 rate), despite that Mr. Flynn and Ms. Monroe have 12 and 9 years' more experience, respectively, and their rates are less than 70% that of someone with comparable experience, Ms. Leiden;

d. Ms. Emhardt's rate of $560 is just 64% of the rate of Messrs. Tsukerman and Sherman ($875 each), who have the same amount of experience; and

e. Our paralegal rate ($240) is approximately 30% less than Winston & Strawn's ($340).

21. Another recent fee application by large defense firm, Fenwick & West, involved the following, similar rates.

///

///

///

*Andrade-Heymsfield v. NextFoods, Inc.*, 21-cv-1446-BTM-MSB
SUPPLEMENTAL DECLARATION OF JACK FITZGERALD

| Timekeeper | Experience | 2023 Rate | Title |
|---|---|---|---|
| Eric Ball | 18+ years | $1,410 | Partner |
| Molly Melcher | 14 years | $1,355 | Partner |
| Todd Gregorian | 20 years | $1,375 | Partner |
| Kimberly Culp | 18+ years | $1,240 | Counsel |
| Tony Fares | 7 years | $1,185 | Associate |
| Ethan Thomas | 7 years | $1,185 | Associate |
| Ryan Kwock | 4 years | $950 | Associate |
| Katie Hauh | 2 years | $710 | Associate |
| Sofiya Andreyeva | 2 years | $710 | Law Clerk |
| Jeremy Ra | 11 years | $610 | Paralegal |

*See Yuga Labs, Inc. v. Ripps*, 2024 WL 489248, at *3-5 (C.D. Cal. Jan. 11, 2024) (discussing rates at length and finding them reasonable).

22.    My 2024 rate of $885 is just 63% of Mr. Ball's 2023 rate of $1,410, despite that I have at least one more year of experience. The same is true for our remaining timekeepers—all of our rates are substantially below those of Fenwick & West timekeepers with significantly less experience.

23.    Although Winston & Strawn and Fenwick & West's applications were made in courts in the Central District of California, courts in this district have found evidence of rates in Los Angeles helpful in determining the reasonableness of rates in San Diego. *See Arana v. Monterey Fin. Servs. Inc.*, 2016 WL 1324269, at *2 (S.D. Cal. Apr. 5, 2016) ("The Court's independent research suggests that Los Angeles and San Diego rates are similar," such that "applying a Los Angeles rate *slightly* overcompensates" counsel (emphasis added)); *see also Ronquillo-Griffin v. TransUnion Rental Screening Solutions, Inc.*, 2019 WL 2058596, at *10 (S.D. Cal. May 9, 2019) (citing *Pom Wonderful, LLC v. Purely Juice, Inc.*, 2008 WL 4351842, at *4 (C.D. Cal. Sept. 22, 2008), for support that counsel's requested rates were reasonable).

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge. Executed this 15th day of March 2024 in San Diego, California.

By:    /s/ Jack Fitzgerald
Jack Fitzgerald

**Table of Exhibits**

| Exhibit | Description | Beginning Page |
|---------|-------------|----------------|
| 1 | Thompson Reuters, 2024 Report on the State of the US Legal Market | 1 |
| 2 | National Law Journal's 2015 Billing Report | 32 |
| 3 | United States Consumer Law Attorney Fee Survey Report 2017-2018 | 37 |
| 4 | Winston & Strawn Fee Application | 41 |

*Andrade-Heymsfield v. NextFoods, Inc.*, 21-cv-1446-BTM-MSB
SUPPLEMENTAL DECLARATION OF JACK FITZGERALD

# Exhibit 1

**GEORGETOWN LAW**
Center on Ethics and the Legal Profession

**Thomson Reuters Institute**

# 2024 Report on the State of the US Legal Market

## The Challenge of Targeting the Right Markets with the Right Offerings



# Executive summary

Leaning on the historical example of Pan Am Airways, the *2024 Report on the State of the US Legal Market* highlights fundamental shifts in the legal marketplace over the past 15 years and how law firm leaders who fail to respond to those changes and pivot quickly enough to prepare for the future may see their firms destined for the same fate as Pan Am.

Key among the report's findings is the shift from what the report dubs "the Transactional Decade" of the 2010s — a period marked by easy-to-borrow money and strong performance for law firms' transactional practices — to the more recent period in which the majority of growth in demand for law firm services has relied on counter-cyclical practices like litigation, bankruptcy, and labor & employment, which tend to run counter to general economic conditions.

The report also discusses the rapid increase in the pace of law firm rate growth, particularly over the past few years. In 2023, the rates clients agreed to pay law firms for new matters grew by more than 6%, with every segment of law firms seeing aggressive increases in worked rates on par with the pace seen prior to the Great Financial Crisis of 2008-'11 (GFC). At the same time, however, many law firms have seen their ability to collect on those increasing rates falter, and clients have become more aggressive about trying to tier work to lower-cost firms as a way to control costs.

*Key to law firm performance today is the shift from the Transactional Decade of the 2010s to the growing recent strength of counter-cyclical practices.*

© Thomson Reuters 2024

## Among other key findings in the report:

**Different segments of law firms have taken drastically different approaches to staffing strategies** with the largest firms actively cutting back on associate headcount, which continues to become more expensive due to salary increases. Meanwhile, Midsize law firms have grown associate ranks aggressively.

**Expenses have moderated somewhat compared to 2022**, but the general picture for expenses remains unclear due to persistent high growth in overhead expenses and a seeming resurgence in direct expense growth due to new increases in salary and associate hiring trends.

**Sagging productivity and declining realization have combined to put a pinch on law firm profitability growth** such that even the high pace of rate growth has been largely unable to remedy the situation.

**Buyers of legal services seem to be reverting to prior preferences for specialist knowledge, responsiveness, and global coverage** when they select their outside counsel.

Unsurprisingly, the advent of generative artificial intelligence (Gen AI) also factors heavily into the analysis of what lies in store for the legal industry in 2024 and beyond. On the whole, law firm leaders appear to be optimistic about the potential that Gen AI offers for the future of the practice of law, but some skepticism remains. The report offers a look at three of the potential scenarios that may befall the legal industry as Gen AI comes into its own, each with varying degrees of impact on how law firms serve their clients and the level of mutual benefit this technology could bring to legal industry stakeholders.

© Thomson Reuters 2024

# The State of the US Legal Market

Pan American Airways (popularly known as Pan Am) was the world's largest international air carrier for much of the 20th century. It was a pioneer in the modern airline industry, introducing a long list of innovations including jet travel, jumbo jets, scheduled round-the-world service, and computerized reservation systems. For 25 years following World War II, Pan Am literally dominated the market for international air travel. Unfortunately, however, this success was not to last. Perhaps lulled into a false sense of security by its extraordinary competitive dominance, Pan Am's management failed to appreciate the dramatic changes that were underway in the US airline industry. And that lack of perception ultimately proved fatal to efforts to revive the airline following a series of unexpected economic blows. What was once one of the premier service providers in its industry found itself stuck with the wrong routes and the wrong planes, and management's efforts to change proved too late to save the company.

Pan Am's operating model was to fly passengers to foreign destinations from two primary *gateway ports* — New York and Los Angeles. Anticipating an increase in international travel in the years following World War II, the airline doubled down on its gateway strategy by investing heavily in large aircraft that could carry previously unimagined numbers of passengers.

> *What was once one of the premier service providers in its industry found itself stuck with the wrong routes and the wrong planes and its efforts to change proved too late.*

In 1966, for example, Pan Am became the first customer for the Boeing 747, placing a $525 million order for 25 of the aircraft. In fact, the iconic Boeing 747 was "made to order" to Pan Am's specifications for a plane two-and-a-half times larger than the Boeing 707. In 1964, the airline launched PANAMAC, a large computer that occupied an entire floor of the Pan Am Building in midtown Manhattan to manage worldwide airline and hotel reservations. Promoting itself as the *World's Most Experienced Airline*, Pan Am flew 150 jets to 86 countries on every continent except Antarctica. It became the gold standard of air travel, and its brand became an icon for quality and first-rate service. During the late 1960s and early 1970s — at the peak of its performance — Pan Am's cash reserves totaled some $1 billion. In 1970, it carried 11 million passengers over 20 billion miles. By all outward appearances, the Pan Am strategy seemed to be working well. Significant market changes, however, were already in play.

One of the most important of these changes was growing competition from other airlines, in both the domestic and international US air passenger markets. As competition from airlines

© Thomson Reuters 2024

like TWA, United, Braniff, and Northwest grew, it soon became apparent that Pan Am was at a serious disadvantage because the company lacked a US domestic network to feed flights into its gateway hubs in New York and Los Angeles. Although Pan Am coveted domestic routes for some time, it was not until 1980 that it acquired National Airlines in an effort to expand its network. Unfortunately, that acquisition ultimately did little to feed Pan Am's gateway ports. Pan Am's focus on trying to protect its international routes using the same strategy that had served it well for a quarter century left it unprepared to respond effectively to an increasingly competitive US market.

Compounding the problem, Pan Am was also too dependent on jumbo jets. The airline had invested in its large fleet of Boeing 747s in the mid-1960s, expecting that air travel would continue to increase. Unfortunately, it did not. The oil crisis in 1973 dramatically increased the cost of aviation fuel, triggering an economic slowdown that resulted in a sharp reduction in air travel just as Pan Am was rolling out its new jumbo fleet. The downturn thus hit Pan Am particularly hard, given its large fleet of jumbo jets and its exclusive reliance on long-haul international routes. Strategically, Pan Am was simply not positioned as well as its smaller, more diversified, and more nimble competitors to weather the economic storm.

> *It is a key job of managment to prepare for unexpected but inevitable crises by keeping their organizations risk resilient and on a sound strategic footing.*

By the mid-1970s, Pan Am had lost hundreds of millions of dollars in accumulated losses and its debts approached $1 billion. As the company's financial condition worsened, management began to dispose of non-core assets like real estate and hotels, and tried to restructure its fleet. By 1985, however, as the airline continued to operate in dire financial straits, core assets had to be put on the table. That year, Pan Am sold its entire Pacific Division (which comprised 25% of its route system) to United for $750 million.

The final blow came three years later in December 1988 in the form of a terrorist bomb on Pan Am Flight 103 over Lockerbie, Scotland. The incident resulted in the loss of 270 lives and had a profound impact on the public's perception of Pan Am's safety and security. The resulting decline in bookings further exacerbated the airline's financial problems. From that point, it was only a matter of time until the inevitable conclusion. In January 1991, Pan Am filed for bankruptcy protection.

Of course, no one at Pan Am could have foreseen the terrorist bombing over Scotland or perhaps even the oil crisis in 1973, but it is a key job of management to prepare for unexpected but inevitable crises by keeping their organizations risk-resilient and on a sound strategic footing. And this is precisely where the leadership of Pan Am stumbled — by continuing to follow a highly vulnerable strategy even as changes in market conditions

© Thomson Reuters 2024

made the strategy increasingly risky. For years, management stuck with the model of an international-only airline flying out of key gateway cities with a fleet of fuel-inefficient jumbo jets, and without the benefit of a domestic feeder network. When they finally realized they were too focused on the wrong routes with the wrong equipment, it was too late.

This recounting of the failure of Pan Am's leadership to fully appreciate the fundamental changes at play in the airline industry and to take early steps to mitigate the risks those changes posed for the company, holds an important lesson for law firm leaders today. Dating back to at least the GFC in the late-2000s, there have been fundamental changes in the balance of power in the legal market that have increasingly challenged most of the traditional assumptions about how law firms should be run and how legal services should be delivered. Some law firms have responded proactively to these changes, but many have not, relying instead on tactics that served them well in the past but are no longer as effective. Moreover, as was the case with Pan Am, market conditions have been such that the full effects of the changes have, to some extent, been masked until the economic crises of the last couple of years.

© Thomson Reuters 2024

# The financial picture of 2023

To begin to understand what the future holds, we must first understand where we are today and how we arrived here. The first component of that is understanding where today's law firms stand financially.

Across the legal industry, 2023 proved to be an encouraging — though not outstanding — year, at least according to many financial indicators. Legal demand, worked rates, fees worked, and attorney headcount all posted positive numbers, buoying a legal market that continues to be plagued by weak demand growth and declines in productivity. As expense growth moderated throughout the year, these factors combined to help many firms return to profitability.



Figure 1: **Key performance measures**

Year-over-year change   ■ YTD Nov: '23 vs. '22   ■ 2022 vs. 2021

| | Demand | Worked Rates | Fees Worked | Productivity | Lawyer Headcount (FTEs) |
|---|---|---|---|---|---|
| YTD Nov '23 vs '22 | 1.1% | 6.0% | 7.3% | -2.3% | 3.3% |
| 2022 vs 2021 | -0.6% | 4.7% | 4.4% | -3.9% | 3.3% |

All timekeepers; billable time type; non-contingent matters.

*Source: Thomson Reuters 2024*

## Demand

Demand for legal services[1] grew by an average of 1.1% across the industry.[2] However, the distribution of demand growth is somewhat telling. In last year's edition of this report, we discussed the concept

| Demand growth | YTD Nov 2023 |
|---|---|
| **Am Law 100** | 0.0% |
| **Am Law Second Hundred** | 0.6% |
| **Midsize** | 2.4% |

*Source: Thomson Reuters 2024*

---

1   For the purposes of this report, demand is defined as total billable hours worked. Demand growth metrics report the year-over-year change in total billable hours for the average law firm during the period examined.

2   Financial data for this report is provided by Thomson Reuters Financial Insights. Data is based on reported results from 179 US-based law firms, including 48 Am Law 100 firms, 49 Am Law Second Hundred firms, and 82 Midsize firms (US-based firms ranked outside of the Am Law Second Hundred). Legal buyer sentiment data is from Thomson Reuters Market Insights, which provides legal buyer information from around the globe based on annual interviews with around 2,500 legal buyers with revenues above $50 million (US).

© Thomson Reuters 2024

of demand mobility as a contributing factor for the strong demand growth performance of Midsize law firms compared to their Am Law-ranked peers. That same trend was in effect for much of 2023 as Midsize law firms once again led the market for demand growth, growing demand by an average of 2.4%. Am Law 100 firms, by contrast, posted flat demand growth, while average demand for the Am Law Second Hundred grew by 0.6%.

To understand the differences in demand growth across market segments, it is necessary to take a deeper look at the growth in particular practices.

Figure 2: **Practice demand growth**



Year-over-year change    ■ YTD Nov: '23 vs. '22    ■ 2022 vs. 2021

| | Bankruptcy | Litigation | Regulatory | Labor & Employment | IP - Patent Prosecution | Antitrust | Corporate (all) | Mergers & Acquisitions | IP - Patent Litigation | Tax | Real Estate |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2022 Proportion | 2% | 26% | 3% | 11% | 5% | 1% | 25% | 4% | 4% | 3% | 6% |

*All timekeepers. Billable time type; non-contingent matters.*

*Source: Thomson Reuters 2024*

Those who have followed our reporting throughout the past year will be well acquainted with our ongoing discussion of the shifting balance between transactional and counter-cyclical practices. Counter-cyclical practices are those that trend upwards as the economy falters, including litigation, labor & employment, and bankruptcy. Litigation, which accounts for slightly more than one-quarter of all demand hours tracked, was the biggest driver of overall demand growth in 2023, growing by a 15-year high of 3.2%. This historic boost, coupled with uplifts from the other counter-cyclical practices, as well as smaller lifts from regulatory, patent prosecution, and antitrust work, pushed the legal market as whole into positive territory despite the continuing contraction of transactional practices.

The differences in practice demand, however, can help explain the uneven distribution of results across market segments in 2023.



Figure 3: **Transactional vs counter-cyclical practice demand growth by segment**



All segments of law firms saw a lift from the continued strong performance of counter-cyclical practices, but with key differences. For Am Law 100 law firms, for example, the biggest counter-cyclical boost came from growth in bankruptcy hours, which account for only a small proportion of total demand in the Am Law 100. By contrast, Midsize law firms saw their biggest counter-cyclical gain in litigation hours, a much more significant lift due to the practice's much larger proportional share.

Am Law 100 law firms, however, were simultaneously hit with significantly larger contractions in transactional practices, a result that ensured a flat overall growth rate for the year.

## The client view of their legal spend

The future may hold good things for law firms looking to grow demand, whether they hope to do so through capturing market share from competitor firms or through winning more new business from clients.

© Thomson Reuters 2024

Figure 4: **Net spend anticipation**

**Total legal spend anticipation: Global companies with $1B+ in annual revenue**
(Percent of buyers planning to increase versus planning to decrease)



*Source: Thomson Reuters 2024*

On balance, far more clients report that they expect to spend more on outside counsel in the coming 12 months than say they expect their outside counsel spend to decrease. Two-in-five general counsel (GCs) said they expect outside counsel spend to increase, double the percentage who said they anticipate a decrease. The result is a Net Spend Anticipation[3] (NSA) score of 18, nearly on par with the figures posted for this metric in 2021 and 2022.

Looking at NSA scores by practice area, we see that on balance, GCs foresee an increase in spend to continue to drive counter-cyclical practices like labor & employment and litigation. Interestingly, however, regulatory work and corporate matters are also seen as areas ripe for additional spend in the coming year.

It's important to note that NSA does not track the size of anticipated increases — an anticipated modest increase in spend would count the same in this metric as an anticipated doubling of the budget — but the overall perspective that spend across a wide range of practice areas could increase, including potentially some transactional practices, may be an indicator of potential demand growth for law firms in 2024.

It may seem incongruent that in-house counsel plan to both handle more matters internally, as we discuss later in this report, and increase their outside counsel spend, but it can perhaps be explained. As matter volumes increase, many corporate law departments struggle with

---

3   Interviewees were asked whether they expect their outside counsel spend to increase, decrease, or stay the same over the next 12 months. Net Spend Anticipation is calculated by subtracting the percentage of respondents who said they anticipate a decrease from those who said they anticipate an increase.

© Thomson Reuters 2024

capacity. They recognize that, despite a desire to do more work in-house, they will not be able to undertake a large-scale shift away from their outside law firms. At the same time, many GCs are anticipating an increase in outside counsel spend because they are anticipating an increase in law firm rates, an eventuality that seems quite likely given the trends of the past few years. Consequently, corporate general counsel could, quite understandably, intend to do more work within their own departments but still anticipate having to spend more on outside counsel.

## Law firm rates

Law firm rates continued to rise sharply in 2023, reflecting a trend that has been ongoing for more than a decade, although sharply accelerating since 2019.

Figure 5: **Worked rate growth**



All timekeepers. Billable time type; non-contingent matters.
Inflation (PCE) measure = Personal Consumption Expenditures Excluding Food and Energy.

*Source: Thomson Reuters 2024*

Worked rates, the negotiated rates clients agree to pay to law firms for particular matters, have risen at a relatively dramatic pace over the past five years. The past two years, in particular, have seen the pace of worked rate growth begin to rival figures from before the GFC of the late-2000s.

In 2022, the market saw a rare phenomenon as worked rate growth was actually eclipsed by the growth in inflation, an occurrence never before seen in our data. In response, many law firms pursued aggressive rate growth strategies in 2023, leading all three major law firm segments to post worked rate growth averages not seen since 2008.

The positivity from rate growth, however, was tempered by the fact that, as rates grew, collected realization against those higher rates softened. By and large, that was not due

© Thomson Reuters 2024

to clients pushing back on invoices. Instead, it can be largely attributed to attorneys within the law firms proactively adjusting bills *downward* before they were sent to clients.[4] This increase in write-downs resulted in a decrease in a metric known as billing realization. And as we've seen for several years now, as *billing realization* improves, so does the percentage of the worked rate the law firm actually collects, known as *collected realization*. However, when billing realization declines, so too does collected realization. From at least the second quarter of 2022 through almost the end of 2023, law firm billing realization fell, ending the year with law firms collecting an average 90.5% of their worked rates. Recent stabilization in realization is encouraging, but realization remains 0.8 percentage points *below* its 2022 peak and more than a full percentage point down for the Am Law 100.

Figure 6: **Collected realization against worked rates**



Lawyers only. Billable time type.

Source: Thomson Reuters 2024

## Attorney headcount and productivity

Since 2012, lawyer headcount growth has routinely outpaced growth in demand. In fact, only in rare cases has the opposite been true. This discrepancy is understandable as most law firms want to ensure they have the resources to meet unexpected spikes in demand growth such as occurred at the end of the GFC in 2010 and 2011. The downside of this strategy, however, is that this imbalance can place a drag on attorney productivity. For most of the past decade, demand has fluctuated between slight growth and slight contraction. At the same time, attorney headcount has grown relatively consistently, and at times quite aggressively. The result is many more attorneys vying for a share of work — a formula for declining per-lawyer productivity.

---

4   For a more complete discussion of some of the factors negatively impacting realization, see the Thomson Reuters Institute report *Law Firm Rates in 2023* at https://www.thomsonreuters.com/en-us/posts/legal/law-firm-rates-report-2023.

© Thomson Reuters 2024



Figure 7: **Demand vs. lawyer (FTE) growth**

Year-over-year change — Demand — Lawyer growth ■ Productivity gains ■ Productivity loss

Lawyers (contractors excluded)

*Source: Thomson Reuters 2024*

Like other metrics, however, productivity in 2023 varied among different market segments. This is best seen by looking at productivity on a per-lawyer basis.



Figure 8: **Average daily demand per lawyer (FTE)**

— 2021 — 2022 ■ 2023

Am Law 100

Am Law Second Hundred

Midsize

Lawyers. Billable time type; non-contingent matters.

*Source: Thomson Reuters 2024*

Midsize law firms saw the highest demand growth of any segment for the year.[5] However, because of different strategies for headcount growth across the market, the advantage that Midsize firms gained in demand growth did not translate into a similar lead in productivity. In

5   See supra at pp 7-8.

terms of average daily demand (ADD) — essentially, the hours put into work-in-progress per lawyer per day — Midsize law firms trailed Am Law 100 firms by an appreciable margin. This resulted primarily from differences in how the segments approached headcount management in 2023.

Figure 9: **Lawyer FTE growth – change since January 2022**



Lawyers (contractors excluded)

*Source: Thomson Reuters 2024*

If we set January 2022 as a baseline point, we can see stark differences between the segments. Midsize law firms, in particular, stand out as leading the way in headcount growth, adding in excess of 7% more lawyer full-time equivalents (FTEs). At the same time, Am Law 50 firms pursued aggressive reductions in associate headcount throughout most of 2023.

Even accounting for the 2023 associate class hired in the fall, overall headcount was quite similar to where it stood in November 2022. This stands in stark contrast to the practices of even Am Law 51-100 firms.

These differences in strategies were also evident in the hiring trends from this past fall.

Figure 10: **Diverging strategies – staffing decisions**

| Segment | Year long actions | 2023's Associate class |
|---|---|---|
| | **Associate headcount change**<br>Nov '23 vs. Jan '23 | **First year associate headcount change**<br>Sep-Nov '23 vs. Sep-Nov '22 |
| **Am Law 100** | **+1.7%** | **-15.2%** |
| **Am Law Second Hundred** | **+8.5%** | **-9.8%** |
| **Midsize** | **+11.8%** | **-3.2%** |

*Source: Thomson Reuters 2024*

© Thomson Reuters 2024

On average, even after bringing in fall classes, associate ranks for the average Am Law 100 law firm had grown only 1.7% compared to the start of the year. Midsize law firms, by contrast, saw their associate headcount grow by 11.8% throughout the year.

## Expenses and investments

On the whole, expenses and profitability trended in a favorable direction for the legal market in 2023. While growth rates for both direct and overhead expenses[6] remained higher than typical industry levels over the last decade, the fact that growth in each category shifted down throughout the year is encouraging.

Figure 11: **Expense growth**

**Rolling 12-month year-over-year change**   — Direct   — Overhead



*Source: Thomson Reuters 2024*

This decline in overall expense growth has been driven by a few key factors.

While direct expenses continue to be a burden on firms' bottom lines, the fundamental drivers of this category's growth have shifted since the intense competition for talent in 2021 and 2022. At least until recently, law firms, in general, were benefitting from more stable attorney salary scales following intense salary wars of those years. That calming of salary increases had finally allowed the increasing cost of attorney salaries to be normalized over time. This, in turn, translated into an expense growth picture in which a single factor — increasing headcount — was the primary driver of aggregate direct expenses growth. More recent events indicate this normalization may be short-lived, however, as another round of associate salary increases may be in the offing.[7]

---

6   For these purposes, direct expenses refer to those expenses related to fee earners, primarily the compensation and benefits costs of lawyers and other timekeepers. Overhead (or indirect) expenses refer to all other expenses of the firm, including occupancy costs, administrative and staff compensation and benefits, technology costs, business development expenses, and more.

7   See, e.g., Zaretsky, Stacy, "Associate Compensation Scorecard: Biglaw's 2023 Cash Bash," *Above the Law* December 1, 2023, available at https://abovethelaw.com/2023/12/biglaw-raise-bonus-tracker-2023.



Figure 12: **Direct expense per lawyer FTE growth**

Rolling 12-month year-over-year change

■ Am Law 100   ■ Am Law Second Hundred   ■ Midsize   ─□─ All Segments

*Source: Thomson Reuters 2024*

The trend of single-factor-driven direct expense growth, in which headcount growth is the sole driving factor, had its most apparent benefits within the Am Law 100, which saw essentially flat direct expense growth on a per-lawyer basis. For that segment, aggregate direct expense growth expanded in line with headcount.

Midsize law firms saw some cooling in their aggregate direct expenses throughout 2023, despite their aggressive headcount growth and stickier per-lawyer costs. This was primarily due to Midsize firms' growth rates being compared against less-dramatic increases from the previous year. Firms in this segment had much more steady, normalized growth in direct-per-lawyer expenses than firms in either the Am Law 100 or Second Hundred segments.

Am Law Second Hundred firms, on the other hand, saw the worst of both worlds, with persistently higher direct-expense-per-lawyer growth than their Midsize law firm colleagues, driven by more aggressive salary increases than Midsize firms. Am Law Second Hundred firms also enacted less aggressive headcount controls than did firms in the Am Law 100.

With overhead (indirect) expenses, firms across the board saw increases partially driven by return-to-office strategies[8] (especially among Am Law 100 firms), and higher core[9] overhead costs, which are much harder to reduce on a month-to-month basis. The average firm saw its overhead expense growth climb by 7.1%, with core overhead expense growth accelerating to 6.3% from last year's 4.5%.

Despite the improvements seen in the rate of overall expense growth, the persistence of increasing expenses, coupled with the other factors we've discussed, resulted in 2023 being a challenging year for many law firms in terms of profitability.

---

8   Return-to-office expenses include office expenses associated with actually operating the office space, marketing & business development, recruiting, and other related expenses.
9   Core overhead expenses include support/professional staff compensation, benefits, occupancy (leases), technology, knowledge management, and similar expenses.

© Thomson Reuters 2024

Figure 13: **Profit per lawyer growth**



*Source: Thomson Reuters 2024*

Even as rates grew at a decade-high pace and counter-cyclical practices provided some demand growth, it was, for the most part, not enough to overcome the drag placed on profitability by declining realization, softening productivity, and still-elevated expense growth.

Interestingly, even though the Am Law 100 and Midsize law firms experienced roughly parallel trajectories in their profitability improvement throughout the year, they did so based on widely divergent strategies.

For the Am Law 100, improvement in the profitability picture was driven by a combination of the high pace of rate growth and sharp headcount reduction, *i.e.*, expense management. These elements, while successful in the short term, carry potential longer-term implications as clients potentially push back on rate structures or look to move work to lower-cost firms, and as smaller associate classes pose their own potential risks to future leverage.

For Midsize firms, they too were more aggressive about worked rate growth, but to much less of an extent than their larger competitors. Yet, they were quite aggressive about hiring. The improvement in profitability for Midsize firms was more organic, benefiting from rate increases and a second year of market-leading demand growth. This too, however, presents potential future pitfalls should demand shift back to larger firms. Given their efforts to staff up, many Midsize law firms may find themselves in a position of having a larger supply of lawyers than their demand is able to support.

© Thomson Reuters 2024

# How did we get here?

## Ripples from the past reverberating today

As indicated in the data described above, it has become increasingly apparent over the past couple of years that a *sorting out* is occurring in the legal market in which certain firms and sectors are performing significantly better than others. To understand why this is happening — and especially, why it is happening *now* — requires a deeper look at the underlying forces that have been at play in the legal market over the past several years. While such an exercise in their own market may have proven useful to the leaders of Pan Am many years ago had it been done, today such an undertaking is critical for law firm leaders as it may provide helpful insights about where the legal market is headed in both 2024 and the years beyond.

For the purposes of our analysis, we have undertaken a look back at law firm performance data over the past 15 years, *i.e.*, since the onset of the GFC in late-2007-2008.

Figure 14: **Historical demand growth**



**Year-over-year change**

All timekeepers. Billable time type; non-contingent matters.

*Source: Thomson Reuters 2024*

During the period of the GFC and immediately after, market power shifted decisively from law firms to their clients, rapidly moving from a sellers' to a buyers' market for legal services in all segments. Prior to the GFC, law firms largely controlled all important decisions regarding legal matters — from planning and scheduling to staffing, daily managing, and of course, pricing. After the GFC, this was no longer the case. Clients emerged from the crisis firmly in control of all aspects of their matters. They began monitoring the work of their outside law

firms, providing direct oversight of the day-to-day management of their matters. To win work, a law firm now needed to show it could deliver quality outcomes efficiently, cost effectively, and more predictably than its competitors.

At the same time, from 2011 through early-2020, the legal industry entered a period we call the Transactional Decade, in which the legal market enjoyed an unprecedented 10 years of low-interest rates that drove demand in transactional practices, particularly corporate finance and M&A. This development supported law firm revenues despite the underlying market changes that followed the GFC. Law firms in all segments of the market, most particularly the Am Law 100, benefitted from increased demand for services related to transactional matters, as reflected in steady profit growth throughout the decade.

The relative strength of transactional practices continued into the period of volatility around the onset of the global pandemic in early-2020. In fact, demand growth in transactional practices[10] outpaced growth in counter-cyclical practices[11] in nearly every year through 2022. By 2023, however, demand for transactional work fell into negative growth territory, leading to a 6.2% gap between the two practice groupings on a rolling 12-month basis as of November 2023.

Figure 15: **Transactional vs. counter-cyclical growth (2008-2023)**



All timekeepers. Billable time type; non-contingent matters.

*Source: Thomson Reuters 2024*

---

10  For our purposes in this report, transactional practices include general corporate, M&A, real estate, and tax practices.

11  For our purposes in this report, counter-cyclical practices include litigation, bankruptcy, and labor & employment.

© Thomson Reuters 2024

## Clients asserting their new-found influence

Following the GFC, the fundamental shift in market power from law firms to their clients continued to grow. For example, corporate clients came to regard their outside lawyers more as *vendors* rather than *trusted advisors*, as reflected in the increased involvement of corporate procurement departments in the selection and management of outside law firms, as well as in the marked increase in the use of request-for-proposals (RFPs) and other competitive processes to select outside counsel.

The new market forces were also apparent in the growing use of budgets for all major projects and the imposition of client-mandated budget caps. In addition, clients became enamored of disaggregating (or *unbundling*) legal work to assemble virtual teams of different firms and outside lawyers to work on a single matter. It also became a common practice for clients to impose outside counsel guidelines (OCGs) that supplemented (or usually superseded) provisions in engagement agreements, sometimes changing important terms.

> *There is no question that, during the Transactional Decade, clients increasingly turned to lower-priced firms for many of the services that they had previously sought from firms higher in the market ranks.*

Firms, unfortunately for them, were slow to respond to these new client pressures, doing so mostly reactively.  However, the full impact of the market changes were at least partially cushioned by strong transactional demand growth.  Thus, many firms failed to notice as clients quietly pushed certain kinds of legal work down market — a concept we called *demand mobility* in last year's report.

There is no question that, during the Transactional Decade, clients increasingly turned to lower-priced firms for many of the services that they had previously sought from firms higher in the market ranks. Thus, we saw the shifting of certain transactions from Am Law 100 firms to Am Law Second Hundred firms or to Midsize firms. Similarly, there was a clear shift in litigation demand away from higher- to lower-priced service providers. These shifts were subtle, however, as clients simply moved some of their business to a different segment of the market, without notifying their prior providers. As a result, some firms retained a false sense of security even as client work was slipping away.

It has only been during the period of volatility that began with the global Covid-19 pandemic in 2020 and continues today with a prolonged period of economic uncertainty that we have been able to see the full impact of the fundamental market shifts that occurred some 10 years ago. This period of volatility has dramatically increased competition across the market and has resulted — not surprisingly — in a sorting out of firms in terms of financial performance that we expect to continue into 2024 and beyond. It is also a development that law firm leaders need to more fully understand to guide their firms forward successfully.

© Thomson Reuters 2024

# The past as prologue?

Against this background of overall market performance and a look at the key drivers of that performance over the past decade or so, we can turn to how these developments may translate into future opportunities for law firms.

Increasing rates have really been the underlying foundation of improved profitability for most law firms since the GFC, particularly because, as we've shown, demand growth has been relatively lackluster for most of that period.

Law firm worked rates have experienced tremendous growth in just the past few years; however, growth in top-line rates has not necessarily been mirrored all the way down to increases in collections.[12]

Increases in rates may have also masked the important phenomenon of demand mobility that has been underway for some time. This year, we can see that the effects of this demand mobility are being felt not only in demand performance, but also in overall legal market economics.

Figure 16 shows the evident disconnect between the worked rate growth experienced by law firms and the effective rates paid by clients.  Essentially, even as law firm rates have gone up aggressively, clients have found ways to reduce timekeeper costs across the board through reallocation of work. And we see that it doesn't take much to reduce what clients are paying for outside legal counsel. Using current average collected rate figures for each segment, we crafted a scenario (seen in Figure 17) in which the current outside counsel utilization of a hypothetical corporate law department was split fairly evenly between Am Law 100, Second Hundred, and Midsize law firms.

### Figure 16: **Changes in rates paid by clients**

| Average law firm worked rate increase 5.7% – YTD June 2023 | | | |
|---|---|---|---|
| Company size by annual revenue | Timekeeper classification | | |
| | Partner | Of Counsel | Associate |
| Under $500M | -1.1% | -3.0% | -3.7% |
| $500M - $2B | -4.6% | -2.4% | -6.1% |
| $2B - $10B | -2.1% | -3.4% | -3.0% |
| $10B + | -6.8% | -7.5% | -8.0% |

*Source: Thomson Reuters 2024*

---

12  See supra. at 8-9.

© Thomson Reuters 2024

Figure 17: **How clients can save on legal costs, while firms raise rates**

| Segment | Law firm name | Collected rates | | Collected rate growth | Proportion of work client assigns to each firm | | |
|---|---|---|---|---|---|---|---|
| | | YTD: Q2 2022 | **YTD: Q2 2023** | YTD Q2: 2023 | YTD: 2022 | **YTD: 2023** | **Change** |
| **Midsize** | Firm A | $405 | **$419** | 3.3% | 30% | **50%** | **+20** |
| **Am Law Second Hundred** | Firm B | $449 | **$465** | 3.6% | 35% | **30%** | **-5** |
| **Am Law 100** | Firm C | $611 | **$638** | 4.3% | 35% | **20%** | **-15** |

| Average collected rate growth for law firms | Average rate that the client sees across their roster | | Growth rate the client experienced |
|---|---|---|---|
| | YTD: Q2 2022 | YTD: Q2 2023 | (YTD Q2: 2023 vs. 2022) |
| **3.4%** | $492* | $476* | **-3.3%** |

*Calculated using sum product of the collected rate($) and proportion for work.

*Source: Thomson Reuters 2024*

By shifting work away from more expensive firms and toward lower-cost ones, our hypothetical law department was able to capture a 3.3% reduction in their average paid rate, an appreciable difference given the number of law firm hours the average corporate law department pays for in a year. Obviously, the higher the portion of work directed to Am Law 100 law firms, particularly Am Law 100 partners, the greater the potential cost savings from later tiering of work.

None of this, of course, should discourage law firms from pursuing rate increases. Many will rightly point out that even with higher rates and shifting demand, realization has remained relatively strong and large law firms have, for the most part, maintained profitability. However, it is vital to recognize the pressure in-house counsel are under to curtail their costs.

Figure 18: **General counsel cost control strategies**

| Strategy | Percentage |
|---|---|
| Efficient processes | 83% |
| Bring work in-house | 69% |
| Discounted rates | 68% |
| Technology/ Automation | 57% |
| AFAs | 54% |
| Triage new matters | 51% |
| Move work to lower-cost firms | 50% |
| Early settlement | 45% |
| Move work to ALSPs | 26% |
| Hiring freeze | 18% |

Which of the following will form a significant part of your cost-control strategy over the coming 12 months?     *Source: Thomson Reuters 2024*

© Thomson Reuters 2024

Looking ahead to 2024 and beyond, it's obvious that clients are likely to continue to be quite aggressive about moving work to more cost-effective law firms, given the potential savings they could see. Law firms looking to retain clients in this environment will need to focus on emphasizing the value and efficiency their work provides to the client while avoiding the pitfalls of devaluing work by emphasizing price. As much as clients are looking to cut costs, they are also being asked to do more with less — those law firms that can demonstrate these capabilities will be better positioned to retain client work.

Similar to demand mobility, there has been an impactful shift in client expectations. As we have noted, immediately following the GFC, client expectations for their outside law firms shifted toward demands for higher levels of efficiency, cost effectiveness, and predictability in the delivery of legal services. These expectations changed somewhat during the unprecedented pandemic crisis, as clients tended to revert to their more trusted advisors to help guide their decisions. As the effects of the pandemic have waned, however, there is strong evidence that clients are returning to their pre-pandemic expectations of favoring firms that meet their broader needs — and that is also likely to have major implications for law firm leaders into 2024 and beyond.

With clients once again placing a particular premium on specialist knowledge, they are looking to hire experts who can supplement the broad spectrum of knowledge available in-house. Clients are also looking for support internationally and are evaluating firms more objectively on their strengths in these required areas, rather than homing in on specific favored lawyers.

Law firm leaders today must understand this change in client expectations and adapt to focus on value provided, efficiencies gained, and expertise offered if they are going to flourish in the years ahead. In short, they must do what the leaders of Pan Am did not — understand their customers' desires were changing and pivot their service to the marketplace.

Figure 19: **Changes in client favorability drivers**

**Notable changes in favorability drivers over time**



■ Pre-pandemic average    ■ Pandemic average    ■ Post-pandemic average

Attributes buyers mentioned *more* during the pandemic

| | | |
|---|---|---|
| Strength of individuals | Client service | Reputation/ profile/brand |
| 13% 19% 13% | 10% 16% 7% | 4% 8% 5% |

Attributes buyers mentioned *less* during the pandemic

| | | |
|---|---|---|
| Global coverage | Responsiveness | Specialist knowledge |
| 8% 6% 9% | 15% 13% 15% | 26% 15% 28% |

*Source: Thomson Reuters 2024*

© Thomson Reuters 2024

# What successful firms can teach us about the future

Against this background, it is useful to consider the strategies of those law firms that appear to have been most successful in recent years. In 2023, we reviewed the financial results for almost 100 law firms over a 10-year period (2013-2022), ranking the firms' compound annual growth rate performance on the basis of revenue per lawyer and profit per lawyer. Those law firms ranked in the top quartile were designated *Dynamic Firms*, and those ranked in the bottom quartile were designated *Static Firms*.[13]

Not surprisingly, Dynamic Firms exceeded Static Firms (and all other firms) in demand growth, worked rate growth, fees worked growth,[14] productivity, and — perhaps surprisingly — lawyer headcount growth.[15] Demographically, Dynamic Firms did not fit a single segment profile, yet there were several key traits that they seemed to share:

- An ability to *read the market* more astutely than their competitors, shifting their practice mix and presumably staffing toward transactional work during the Transactional Decade more quickly than others. They also gradually shifted their practices away from price-sensitive areas and focused on market choices that played to their strengths.[16]

- An ability to balance demand growth and staffing projections better than other firms. Indeed, they experienced only minimal productivity losses despite having stronger headcount growth than other sectors.[17]

- A willingness to expand roles for non-lawyer professionals and more robust investment in technology, marketing & business development, and high-level support staff,[18] as well as smart investments in people, both for fee earners and support staff.[19] In addition, these firms were able to consistently *push work down* the firm's food chain, thus optimizing profit potential through leverage.[20]

In short, Dynamic Firms simply adjusted to the new market realities faster than their competitors — a lesson lost on the leaders of Pan Am. As a result, today's Dynamic Firms are likely better positioned to take advantage of the next wave of change in the legal market — the impacts of generative AI.

---

13  Thomson Reuters Institute, *2023 Dynamic Law Firms Report: What Has Set High-Growth Law Firms Apart for the Last Decade?* at 4-5. Available at: https://www.thomsonreuters.com/en-us/posts/legal/dynamic-law-firms-report-2023.
14  "Fees worked growth" is a firm's total billable hours for a given period multiplied by the average worked rate.
15  Dynamic Law Firms Report, at 6.
16  *Id.* at 8-13.
17  *Id.* at 17-19.
18  *Id.* at 22-25.
19  *Id.* at 25.
20  *Id.* at 18-19.

© Thomson Reuters 2024

# The potential impact of Gen AI

Another factor likely to have a massive impact on many aspects of law firm business such as lawyer headcount, law firm service delivery, pricing, and probably nearly everything else, is generative AI.

A detailed discussion of the challenges posed by Gen AI to the legal market is beyond the scope of this report;[21] however, its potential future impact should not be ignored nor understated.

AI has been in use in law firms for a long time, albeit under different names and in different forms. Recent technology advances in Gen AI large language models have brought its potential into sharp focus along with controversy. Today, just half of large law firms report having an overarching digital transformation strategy at the C-Suite level, even as Gen AI[22] continues to evolve very fast with the pace of adoption hitting unprecedented levels.



Figure 20: **Reaction to AI in the legal profession**

■ A zombie apocalypse     ■ Stepping on a rusty nail     ■ Your favorite snack being discontinued
■ A year's supply of your favorite snack     ■ Dinner with your celebrity crush     ■ Winning the lottery

| | Overall | | | | | |
|---|---|---|---|---|---|---|
| | 9% | 10% | 23% | 38% | 10% | 10% |

**PESSIMISTS** (4 in 10)          **OPTIMISTS** (6 in 10)

Biggest fear: Accuracy, Loss of jobs, Demise of profession          Accuracy          Data security

Sample: 640 Legal Professionals          *Source: Thomson Reuters 2024*

Not surprisingly, the future potential impact of Gen AI on the legal profession is viewed by law firm leaders with a mix of optimism and caution.[23] Yet, a significant number of legal professionals expressed optimism about AI's ability to enhance productivity and efficiency (with 45% saying this) and to free up time for higher-level tasks (38%).

---

21  For in-depth discussions of generative AI and its impact on the legal market, see Thomson Reuters Institute, *Digital Strategy Report: How Law Firms Are Tying Digital Transformation Efforts to Overall Firm Strategy* (2023) available at https://www.thomsonreuters.com/en-us/posts/wp-content/uploads/sites/20/2023/06/Digital-Strategy-Report_2023.pdf; and Thomson Reuters Institute, *ChatGPT and Generative AI within Law Firms: Law Firms See Potential, Eye Practical Use Cases and More Knowledge around Risks* (2023) available at https://www.thomsonreuters.com/en-us/technology/chatgpt-generative-ai-law-firms-2023/.

22  *Digital Strategy Report: How Law Firms Are Tying Digital Transformation Efforts to Overall Firm Strategy* (2023).

23  Thomson Reuters *Future of Professionals* report (2023); available at https://www.thomsonreuters.com/en/campaigns/future-of-professionals.html.

© Thomson Reuters 2024

This brings up another crucial lesson for law firm leaders as they guide their firms into 2024 and beyond: The need to communicate the value that Gen AI-driven efficiencies offer to clients. While much of the early focus for leadership around Gen AI will be on navigating ethical issues, ensuring data accuracy, and enhancing data security, as their employees adapt to this evolving technological landscape, smart leaders will be paying attention to how they can best communicate these benefits to their clients.

To see how this could play out, let's look at a few hypothetical scenarios of what might result from increased Gen AI in the legal industry.[24]

## Scenario One — The rising tide

In this first scenario, the increasing application of Gen AI significantly enhances both client value and law firm profits. Clients benefit from higher-quality advice, faster service, and more creative solutions, while firms see reduced operational costs and improved labor efficiency. This leads to a shift in team composition within law firms as roles for AI-trained lawyers and legal technologists increase. Concurrent with this, the traditional pathway from associate to partner changes, as does the law firm pricing model and the methods of lawyers' internal education.

While the ability for law firms to showcase their value to clients is very likely challenged by this scenario, those firms that can harness innovation to demonstrate that value will more easily be able to differentiate themselves in the crowded legal market going forward.

## Scenario Two — A lopsided landscape

A second scenario involves clients greatly leveraging Gen AI to assert further control over legal services, diminishing law firms' traditional roles to an even greater extent and enabling the vast majority of the technology's value to be claimed by clients at the expense of firms. Here, clients may handle more legal work in-house, relying on external providers only for final validations. Clients also might demand more competitive pricing models from law firms, with capped fees and full transparency, given that Gen AI is doing some of the heaviest lifting — an attitude some clients have already expressed.

Emboldened by this, clients could push further to diversify their legal service providers, enlisting software vendors and consultancies, and dramatically increasing competition for law firms. As mentioned above, for those firms that adopt new innovations but aren't successful at articulating their benefits to clients, this scenario could be especially painful.

---

24 Adapted from the *2023 Australia: State of the Legal Market Report* by Thomson Reuters and the University of Melbourne. Available at: https://www.thomsonreuters.com/en-us/posts/legal/australia-state-of-the-legal-market-report-2023.

© Thomson Reuters 2024

## Scenario Three — No big thing

Another potential scenario is perhaps the least imaginative but is a constant consideration, nevertheless. In it, Gen AI simply does not have a significant strategic impact on law firms, serving instead as an advanced tool for knowledge management and search functions but not substantially altering current legal practices or the overall balance between law firm and client. Gen AI finds utility in operations, marketing, IT, and HR but does not notably change client benefits or firm costs.

While seemingly implausible, it should be noted that some version of this scenario is likely to crop up in isolated pockets. Some firms, practice areas, and regions at one time or another may see little actual difference compared to a world in which the full impact of the latest technology never materialized. Forward-looking law firm leaders need to assess the potential impact of Gen AI on a case-by-case basis, identifying areas where it may be insignificant or, conversely, where it could offer significant opportunities for value growth and an enhanced client experience.

## We're only at the beginning of the AI journey

These scenarios are, of course, only a few visions of the potential future.  They are by no means mutually exclusive, or even the only possible directions Gen AI will evolve in the legal industry.  Time, deeper research, and experience will lead to much more robust understandings of the intricacies of how Gen AI will impact particular practices, industries, firms, and even specific lawyers.  At present, though it is important for law firm leaders to understand that this evolution will happen with or without them.  Planning for scenario three is likely to be the riskiest approach.  And indeed, most law firms seem to be working toward scenario one, at least in certain contexts.

For now, use cases for generative AI in law firms are primarily internally focused, but that will rapidly change over time . Longer term (3-10 years), the technology promises to transform the way law firms work and are structured, as it forces new pricing and leverage models, new ways of relating to clients, and new forms of collaborative partnerships both among firms and with non-law firm providers.

# Conclusion

The primary challenge facing law firm leaders today and in the coming years is their ability to recognize that the legal market has changed fundamentally since the GFC, and that these changes are, in fact, likely accelerating. Although the impact of these changes was difficult to parse in the more robust conditions of the Transactional Decade, they clearly altered the power relationship in the market, shifting it to clients from their outside counsel. Only recently have we begun to understand more completely the full impact of this fundamental market shift.

Today's law firm leaders can choose to ignore these changes but, like the leaders of Pan Am, they do so at their peril. To be sure, embracing the new market realities will be challenging as they run counter to many of the instincts, training, and experience that many senior lawyers hold. What is required, however, is an openness to new ways of thinking about structuring the delivery of legal services in a market that no longer rewards many of the traditional ways of doing things. Along with that, of course, is the keen necessity to be able to communicate with clients the enhanced value the firm can now offer.

Leaders who can rise to this challenge will be able to lead their firms confidently into the future. Those who do not, will — like the leaders of Pan Am — leave their organizations ill-equipped and vulnerable to the vagaries of the marketplace, often offering the wrong services in the wrong ways and wondering why nothing they do is working like it used to.

> *Leaders who are open to new ways of thinking about legal services and communicating with clients will be able to lead their firms confidently into the future.*

© Thomson Reuters 2024

## Credits

### Georgetown University Law Center on Ethics and the Legal Profession

**James W. Jones (Lead Author)**
Senior Fellow and Director of Program on Trends in Law Practice
Jim.W.Jones2011@gmail.com

**Milton C. Regan, Jr.**
Professor of Law and Co-Director of the Center
Regan@law.georgetown.edu

### Thomson Reuters Institute

**Mike Abbott**
Head of Thomson Reuters Institute
Michael.Abbott@thomsonreuters.com

**Marcus Belanger**
Industry Data Analyst – Thomson Reuters Institute
Marcus.Belanger@thomsonreuters.com

**Isaac Brooks**
Senior Industry Data Analyst – Thomson Reuters Institute
Isaac.Brooks@thomsonreuters.com

**Bryce Engelland**
Industry Data Analyst – Thomson Reuters Institute
Bryce.Engelland@thomsonreuters.com

**Bill Josten**
Senior Manager – Enterprise Content Lead for the Thomson Reuters Institute
William.Josten@thomsonreuters.com

**Becky Halat**
Senior Manager, Client Services – Thomson Reuters Institute
Becky.Halat@thomsonreuters.com

**Lucy Leach**
Technical Research Director – Thomson Reuters Institute
Lucy.Leach@thomsonreuters.com

**Regina Lopez**
Industry Data Analyst – Thomson Reuters Institute
Regina.Lopez@thomsonreuters.com

**Steve Seemer**
Senior Director, Thought Leadership & Strategic Relations - Thomson Reuters Institute
Stephen.Seemer@thomsonreuters.com

© Thomson Reuters 2024

**Thomson Reuters Institute**

The **Thomson Reuters Institute** brings together people from across the legal, corporate, tax & accounting and government communities to ignite conversation and debate, make sense of the latest events and trends and provide essential guidance on the opportunities and challenges facing their world today. As the dedicated thought leadership arm of Thomson Reuters, our content spans blog commentaries, industry-leading data sets, informed analyses, interviews with industry leaders, videos, podcasts and world-class events that deliver keen insight into a dynamic business landscape.

Visit **thomsonreuters.com/institute** for more details.

### GEORGETOWN LAW
Center on Ethics and the Legal Profession

**The Center on Ethics and the Legal Profession** at Georgetown Law is devoted to promoting interdisciplinary research on the legal profession informed by an awareness of the dynamics of modern practice; providing students with a sophisticated understanding of the opportunities and challenges of modern legal careers; and furnishing members of the bar, particularly those in organizational decision-making positions, broad perspectives on trends and developments in practice. For more information on the Center, visit our website (Center on Ethics and the Legal Profession) or contact Mitt Regan at regan@law.georgetown.edu.

The Center on Ethics and the Legal Profession **www.law.georgetown.edu/legal-profession**.



© 2024 Thomson Reuters  TR4068991/1-24

# Exhibit 2



**2015 NLJ Billing Survey**

**Source: National Law Journal**

**Category: National Law Journal**

ALM Legal Intelligence, in association with The National Law Journal, collected 2015 hourly billing rates for partners, associates, of counsel and paralegals. The data sources include the published rates from the 20 largest federal bankruptcy jurisdictions and a survey of the nation's 350 largest firms conducted during October and November of 2015.  Individual firm rates are not identified.

**Hourly Billing Rates for 2015**

|  | Partner | | | Associate | | |
|---|---|---|---|---|---|---|
|  | **High** | **Low** | **Median** | **High** | **Low** | **Median** |
| **Overall Hourly Rates** | $1,295 | $90 | $395 | $950 | $50 | $350 |

**Rates by Firm Size**

|  | | | | | | |
|---|---|---|---|---|---|---|
| 1 - 25 lawyers | $1,080 | $90 | $350 | $950 | $90 | $300 |
| 26 - 150 lawyers | $1,050 | $190 | $460 | $900 | $100 | $300 |
| 151 or more lawyers | $1,295 | $100 | $595 | $975 | $125 | $325 |

**Rates by State**

|  | | | | | | |
|---|---|---|---|---|---|---|
| AL | $725 | $200 | $375 | $375 | $175 | $300 |
| AZ | $750 | $125 | $375 | $750 | $175 | $250 |
| CA | $1,080 | $200 | $495 | $950 | $300 | $350 |
| CO | $893 | $350 | $443 | $642 | $150 | $325 |
| CT | $1,200 | $295 | $350 | $625 | $175 | $350 |
| DC | $1,095 | $975 | $1,035 | $655 | $350 | $375 |
| DE | $1,050 | $295 | $650 | $850 | $260 | $388 |
| FL | $625 | $175 | $375 | $525 | $100 | $300 |
| GA | $500 | $250 | $358 | $450 | $110 | $275 |
| IL | $985 | $200 | $420 | $710 | $150 | $300 |
| IN | $400 | $250 | $305 | $400 | $200 | $275 |
| KY | $340 | $200 | $290 | $350 | $200 | $275 |
| LA | $575 | $150 | $333 | $500 | $100 | $250 |
| MA | $650 | $300 | $475 | $500 | $260 | $350 |
| MD | $560 | $250 | $363 | $580 | $150 | $325 |
| MI | $375 | $190 | $265 | $400 | $125 | $275 |
| NC | $675 | $250 | $425 | $435 | $150 | $275 |

| NJ | $880 | $250 | $400 | $400 | $150 | $298 |
|----|------|------|------|------|------|------|
| NM | n/a | n/a | n/a | $350 | $175 | $200 |
| NV | $450 | $295 | $375 | $500 | $200 | $325 |
| NY | $1,295 | $100 | $420 | $975 | $90 | $350 |
| OH | $545 | $250 | $313 | $330 | $155 | $250 |
| OR | $485 | $315 | $370 | $325 | $230 | $300 |
| PA | $875 | $200 | $350 | $565 | $86 | $257 |
| PR* | $300 | $100 | $200 | $350 | $100 | $200 |
| TN | $735 | $225 | $300 | $350 | $150 | $250 |
| TX | $925 | $90 | $395 | $650 | $150 | $298 |
| VA | $545 | $220 | $335 | $495 | $175 | $295 |
| WA | $965 | $275 | $460 | $375 | $150 | $350 |
| WI | $595 | $560 | $578 | n/a | n/a | n/a |

| | Of Counsel | | | Paralegal | | |
|---|------|-----|--------|------|-----|--------|
| | **High** | **Low** | **Median** | **High** | **Low** | **Median** |
| **Overall Hourly Rates** | $1,120 | $125 | $350 | $325 | $25 | $125 |

**Rates by Firm Size**

| 1 - 25 lawyers | $645 | $125 | $350 | $325 | $25 | $115 |
|----------------|------|------|------|------|-----|------|
| 26 - 150 lawyers | $620 | $225 | $393 | $305 | $75 | $173 |
| 151 or more lawyers | $1,120 | $270 | $610 | $325 | $35 | $220 |

**Rates by State**

| AL | $495 | $290 | $393 | n/a | n/a | n/a |
|----|------|------|------|------|-----|------|
| AZ | $750 | $250 | $300 | $250 | $75 | $125 |
| CA | $595 | $175 | $450 | $325 | $25 | $150 |
| CO | $400 | $325 | $363 | $285 | $75 | $158 |
| CT | $550 | $325 | $438 | $290 | $75 | $100 |
| DC | $775 | $275 | $750 | n/a | n/a | n/a |

| | | | | | | |
|---|---|---|---|---|---|---|
| DE | $525 | $260 | $275 | $305 | $125 | $235 |
| FL | n/a | n/a | n/a | $255 | $65 | $123 |
| GA | $250 | $240 | $245 | $160 | $50 | $120 |
| IL | $1,120 | $395 | $430 | $215 | $75 | $120 |
| IN | $300 | $225 | $295 | $220 | $90 | $100 |
| KY | n/a | n/a | n/a | $150 | $75 | $105 |
| LA | $425 | $200 | $350 | $285 | $45 | $83 |
| MA | n/a | n/a | n/a | n/a | n/a | n/a |
| MD | $350 | $250 | $275 | $280 | $75 | $125 |
| MI | n/a | n/a | n/a | $125 | $75 | $103 |
| NC | n/a | n/a | n/a | $180 | $75 | $110 |
| NJ | $565 | $225 | $325 | $195 | $65 | $120 |
| NM | n/a | n/a | n/a | n/a | n/a | n/a |
| NV | n/a | n/a | n/a | $240 | $75 | $152 |
| NY | $930 | $250 | $573 | $325 | $60 | $130 |
| OH | n/a | n/a | n/a | $135 | $85 | $100 |
| OR | $450 | $310 | $380 | $220 | $145 | $185 |
| PA | $440 | $300 | $325 | $325 | $75 | $105 |
| PR* | $250 | $125 | $188 | $150 | $45 | $75 |
| TN | $300 | $270 | $300 | $150 | $50 | $90 |
| TX | $740 | $225 | $320 | $290 | $35 | $100 |
| VA | $400 | $300 | $350 | $325 | $75 | $95 |
| WA | n/a | n/a | n/a | $215 | $125 | $143 |
| WI | n/a | n/a | n/a | n/a | n/a | n/a |

n/a: data not available

*Puerto Rico is a U.S. Territory

# Exhibit 3



# UNITED STATES CONSUMER LAW

# ATTORNEY FEE SURVEY REPORT

## 2017-2018



# Ronald L. Burdge, Esq.

# United States Consumer Law
# Attorney Fee Survey Report 2017-2018

Survey Conducted By
and
Survey Report Authored By

Ronald L. Burdge, Esq.
Burdge Law Office Co. L.A.
8250 Washington Village Drive
Dayton, OH 45458-1850
Voice: 937.432.9500
Fax: 937.432.9503

Email: Ron@BurdgeLaw.com



Attribution, No Derivs
CC-BY-ND

This copyright license allows for redistribution, commercial and non-commercial use, as long as all quoted and selected contents are passed along unchanged and with credit to the publication and author.

Copyright © 2019 by R.L.Burdge
September 10, 2019

This publication contains the results of proprietary research.

This publication was created to provide accurate and authoritative information concerning the subject matter covered. The publisher is not engaged in rendering legal or other professional advice and this publication is not a substitute for the advice of an attorney or expert. If you require legal or other expert advice, you should seek the services of a competent attorney or other professional.

### California, San Diego

| | |
|---|---|
| Average Number of Attorneys in Firm | 3.0 |
| Median Years in Practice | 18.0 |
| Average Concentration of Practice in Consumer Law | 84.2 |
| Primary Practice Area | Consumer Law |
| Secondary Practice Area | Other |
| Last Time Attorney Rate Changed (Average in Months) | 16.92 |
| Average Number of Paralegals in Firm | 1.45 |
| Average Paralegal Rate for All Paralegals | 147 |
| Average Attorney Rate for All Attorneys | 452 |
| 25% Median Attorney Rate for All Attorneys | 331 |
| Median Attorney Rate for All Attorneys | 475 |
| 75% Median Attorney Rate for All Attorneys | 544 |
| 95% Median Attorney Rate for All Attorneys | 700 |

### Median Rate for Practice Areas

| | Median |
|---|---|
| Attorneys Handling Bankruptcy Cases | 400 |
| Attorneys Handling Class Action Cases | 500 |
| Attorneys Handling Credit Rights Cases | 400 |
| Attorneys Handling Mortgage Cases | 400 |
| Attorneys Handling Vehicle Cases | 450 |
| Attorneys Handling TCPA Cases | 425 |
| Attorneys Handling Other Cases | 400 |

# Exhibit 4

Jeffrey L. Kessler (*pro hac vice*)
jkessler@winston.com
David G. Feher (*pro hac vice*)
dfeher@winston.com
**WINSTON & STRAWN LLP**
200 Park Avenue, New York, NY 10166
Tel:    (212) 294-6700
Fax:    (212) 294-4700

Cardelle B. Spangler (*pro hac vice*)
cspangler@winston.com
**WINSTON & STRAWN LLP**
35 West Wacker Drive, Chicago, IL 60601
Tel:    (312) 558-5600
Fax:    (312) 558-5700

Diana Hughes Leiden (SBN: 267606)
dhleiden@winston.com
Lev Tsukerman (SBN: 319184)
ltsukerman@winston.com
**WINSTON & STRAWN LLP**
333 South Grand Avenue, Los Angeles, CA 90071
Tel:    (213) 615-1700
Fax:    (213) 615-1750

Jeanifer E. Parsigian (SBN: 289001)
jparsigian@winston.com
**WINSTON & STRAWN LLP**
101 California St., 35th Floor, San Francisco, CA 94111
Tel:    (491) 591-1000
Fax:    (491) 591-1400

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALEX MORGAN, et al., | **Case No. 2:19-CV-01717-RGK-AGR** |
| Plaintiffs, | Assigned to: Judge R. Gary Klausner |
| v. | **DECLARATION OF JEFFREY L. KESSLER IN SUPPORT OF PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND EXPENSES** |
| UNITED STATES SOCCER FEDERATION, INC., | |
| Defendant. | Date:  December 12, 2022<br>Time: 9:00 a.m.<br>Place: Courtroom: 850 |

I, Jeffrey L. Kessler, hereby declare, under penalty of perjury, as follows:

1.      I am a partner and Co-Executive Chairman of Winston & Strawn LLP, co-lead counsel for Plaintiffs and the certified classes in this matter.  I am also the former co-chair of the firm's Sports Law Practice.  I have personal knowledge of the facts set forth herein and if called upon to testify thereto, I could and would do so.

2.      I submit this declaration, together with the attached exhibits, in support of Plaintiffs' motion for attorneys' fees and expenses.

3.      In its order certifying the Rule 23(b)(2) and 23(b)(3) classes and the collective action (Dkt. 98), the Court appointed my firm as class counsel in this matter.

4.      My and my colleagues' qualifications and extensive experience in class action, sports, and employment matters are described in detail in my declaration in support of Plaintiffs' class certification motion.  *See* Dkt. 64-1.  I have attached here as **Exhibit 1** biographies for the primary team of Winston & Strawn attorneys leading Plaintiffs' case.  These lawyers are all experienced employment, commercial litigation, and/or sports lawyers.  Indeed, Winston & Strawn has one of the leading sports law practices in the country.  Members of the Winston & Strawn litigation team for this case have been involved in some of the most important sports cases of the last three decades and are considered among the most prominent practitioners in this field.  Attached here as **Exhibit 2** are materials about Winston & Strawn's employment and sports law practices that provide additional information about the firm's well-recognized expertise and capabilities.

5.      As detailed more fully below, Winston & Strawn attorneys were extensively involved in all aspects of this litigation.  Winston & Strawn attorneys took the lead on nearly every aspect of litigation before this Court, including: organizing and completing document review; drafting discovery requests and responses; corresponding with defense counsel; leading meet-and-confer discussions with opposing counsel that governed document production, depositions, scheduling, and all other manner of discovery disputes; taking and defending depositions; working with experts; drafting

1

nearly every motion, opposition, and written submission filed with the Court (including on USSF's motion to transfer, class certification, and summary judgment) and handling all related work including legal research, discussion of briefing strategy, and editing drafts; preparing this case for trial; and negotiating and finalizing settlement with USSF. These efforts are described in more detail below.

## PRE-LAWSUIT INVESTIGATION

6.    Before filing suit, Winston & Strawn attorneys thoroughly investigated the merits of Plaintiffs' gender-discrimination claims.    Winston & Strawn attorneys specifically: (1) conducted informational interviews with current and former WNT players; (2) scrutinized the terms of USSF's collective bargaining agreements with WNT and MNT players; (3) analyzed the complicated pay structures in USSF's various CBAs; (4) assessed USSF's historical treatment of its senior national teams in their working conditions; (5) familiarized themselves with the market for and interest in both men's and women's international soccer; (6) developed legal theories grounded in provable facts; (7) corresponded with USSF's counsel on the merits of Plaintiffs' discrimination claims; and (8) represented the four named plaintiffs in their complaint and subsequent investigation before the EEOC, which was a prerequisite to filing the claims in this litigation.

## SUMMARY OF DISCOVERY EFFORTS

7.    Discovery in this case took place for seven months from August 2019 through February 2020.  During this time, Plaintiffs served five sets of document requests containing 67 requests for production and 16 interrogatories.  USSF served interrogatories and over two dozen document requests.  Winston & Strawn attorneys prepared and acted to enforce Plaintiffs' document requests and interrogatories. Winston & Strawn attorneys also worked with Plaintiffs to gather documents and to prepare Plaintiffs' responses to USSF's requests.

8.    The parties produced tens of thousands of documents. Winston & Strawn attorneys spent substantial time collecting, reviewing, and making privilege,

2

confidentiality, and responsiveness determinations for thousands of potential documents to be produced to USSF.  To do so, Winston & Strawn attorneys devised a multi-step review protocol.  Class counsel prepared and produced a 121-page, 1,000-document-plus privilege log for Plaintiffs' productions.  To limit cost, the firm relied on in-firm "review" attorneys and professionals who specialize in e-Discovery and bill at substantially lower hourly rates to assist with document review.  Winston & Strawn associates (with partner oversight) worked with this review team to ensure an efficient document review and production process.

9.      Class counsel also reviewed and analyzed the thousands of documents that USSF produced.  Reviewing such voluminous document productions and analyzing which documents supported Plaintiffs' case (including by identifying the best evidence for use at depositions, trials, and motions) was a major undertaking.

10.     The parties engaged in extensive negotiations regarding the scope and substance of discovery and raised many discovery disputes with the Court during the process.  Discovery negotiations involved numerous calls and correspondence with USSF's counsel.  They also involved extensive discussions on appropriate search terms and custodians that the parties would apply to their document collection.  Winston & Strawn attorneys devised and cross-checked search terms and custodians, testing terms with the assistance of Winston & Strawn's e-Discovery team, to ensure an efficient and thorough document production.

11.     The parties deposed nearly twenty fact witnesses, with Plaintiffs deposing seven USSF witnesses including former USSF Presidents Carlos Cordeiro and Sunil Gulati; the former Chief Commercial Officer, Jay Berhalter; the Managing Director of Administration, Tom King; the former Head Coach of the WNT, Jill Ellis; the Chief Financial Officer, Pinky Raina; and Senior Counsel Greg Fike.  Plaintiffs also deposed third parties Visa and Coke, which are USSF sponsors.  USSF deposed ten fact witnesses, including all four class representatives and Becca Roux, the WNT union's Executive Director.

12.     Plaintiffs retained and Winston paid the fees for three experts: Dr. Finnie Cook, an economist; Dr. Caren Goldberg, a human resource expert and consultant; and Dr. Roger Noll, a well-published sports economist and economics professor at Stanford University.  Collectively, Plaintiffs' experts prepared and submitted six expert reports (covering opening, rebuttal, and supplemental reports).  Class counsel worked closely with these experts as they drafted their reports, formulated their analyses, and sought additional information as the case developed.  Winston & Strawn attorneys assisted Plaintiffs' experts in identifying and gathering the relevant materials for their expert analyses.  USSF deposed each of Plaintiffs' experts. Class counsel prepared Plaintiffs' experts for their depositions.

13.     USSF retained three experts: Phillip Miscimarra, a partner at the national law firm Morgan Lewis, & Bockius LLP; Carlyn Irwin, a senior advisor with the economics consulting firm Cornerstone Research; and Dr. Justin McCrary, an economist and professor at Columbia University.  Mr. Miscimarra and Dr. McCrary opined on the parties' collective bargaining process and agreements plus issues on federal labor law, while Ms. Irwin analyzed revenue and compensation issues.  Class counsel analyzed the reports from each USSF expert.  Class counsel also deposed each USSF expert.

14.     Class counsel spent thousands of hours on fact and expert discovery with the goal of carefully developing a strong record on the parties' claims and defenses.

15.     This case required a thorough analysis of the collective bargaining history between USSF, on one hand, and the WNT and MNT player unions, on the other, going back nearly a decade.  This history yielded multiple collective bargaining agreements that required a side-by-side analysis to identify pay and treatment disparities.  This entailed multi-year comparisons of MNT and WNT players' compensation; their modes of transportation and hotel accommodations; their venue surface conditions; USSF's spend on player airfare, hotels, and meals; and overall team performance.

## TRIAL PREPARATION AND THE WORKING-CONDITIONS
## SETTLEMENT

16.     In the first half of 2020, class counsel spent significant time and resources preparing for trial on both Plaintiffs' pay and non-pay claims.  This included briefing motions in limine (with class counsel drafting 11 such motions and preparing oppositions for USSF's 5 motions in limine) and negotiating, drafting, and exchanging pretrial submissions, including witness lists, deposition designations and counter designations, exhibit lists (which entailed coordinating Plaintiffs' efforts to identify such exhibits and to review USSF's exhibits for objections), and jury instructions.

17.     Even after the Court dismissed Plaintiffs' pay-discrimination claims, class counsel continued trial preparation on the surviving working-conditions claims.

18.     Plaintiffs (with class counsel at the helm for them) have discussed settlement of their pay and working-conditions claims dating back to the EEOC's investigation of Plaintiffs' charges in 2016.  After this lawsuit was filed, Plaintiffs and USSF had a formal two-day mediation with JAMS in August 2019, with class counsel, class representatives, and senior USSF officials and counsel present.  The parties engaged in further informal settlement communications through the close of discovery and pretrial preparation.

19.     From July through November 2020, the parties again discussed settlement of Plaintiffs' working-conditions claims.  This included several formal virtual meetings plus extensive informal negotiation through regular calls and correspondence.  The parties also exchanged multiple drafts of a proposed settlement agreement and policy documents.  During these months, class counsel spent significant time negotiating and finalizing an agreement that would provide for equality in the WNT players' working conditions.

## THE PAY-CLAIMS SETTLEMENT

20.     After the parties settled Plaintiffs' working-conditions claims, Plaintiffs appealed the Court's summary judgment ruling to the Ninth Circuit.  Class counsel

worked closely with co-counsel, Mayer Brown, in fully briefing that appeal and preparing for the then-scheduled March 7, 2022 oral argument.

21.     After appealing to the Ninth Circuit, the parties continued to engage in extensive settlement discussions to resolve Plaintiffs' pay-discrimination claims. Class counsel led those efforts for the classes. These efforts included a full-day mediation in May 2021 that, while unsuccessful in resolving the claims, led to continued dialogue and calls. These informal calls and correspondence led to repeated back-and-forth exchanges of proposed term sheets.

22.     The parties agreed to a settlement of Plaintiffs' pay-discrimination claims in February 2022. This was just weeks before the parties' Ninth Circuit oral argument, which class counsel was simultaneously preparing for. The months of settlement negotiations surrounding Plaintiffs' pay-discrimination claims required substantial time and effort.

### ATTORNEYS' FEES

23.     Class counsel entered into a contingency fee agreement with Plaintiffs. The 28 individual Plaintiffs and class counsel agreed that counsel would be awarded 30% of the total proceeds recovered on behalf of the players, after the reimbursement of expenses, subject to court approval, with the remaining 70% paid to the players.

24.     Class counsel's recovery of attorneys' fees and costs was thus contingent entirely on the outcome of this litigation: if Plaintiffs took nothing, class counsel would take nothing.

25.     The fees by class counsel incurred from attorneys, paralegals, and e-Discovery through April 6, 2022 totaled $11,496,079 (i.e., $11,330,196 for partners, of counsel, associates, and paralegals plus $165,883 from the e-Discovery team). A more detailed explanation and breakdown is set forth below.

26.     From the inception of this case (including Winston & Strawn's pre-filing investigation) through April 6, 2022, Winston & Strawn lawyers and paralegals have invested 15,986.7 hours over a three-year-plus span. The value of that time, using the

historic hourly billing rates of the firm at the time the services were rendered, is $11,330,196. The rates used to calculate these figures are the usual and customary hourly rates charged for each attorney or staff member's services at Winston & Strawn at the applicable time.

27. Detailed below is a list of Winston & Strawn attorneys and paralegals who worked on the case, along with their applicable historical rates and total hours worked for each year of the case. On December 6, 2019, Judge Nathanael Cousins found, in another litigation, that Winston & Strawn's billing rates "rang[ing] from $85 per hour for review attorneys to $1,515 for certain partners … are reasonable." *In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*, No. 14-MD-02541-CW-NC, 2019 WL 12194763, at *3 (N.D. Cal. Dec. 6, 2019), *adopted* (Feb. 24, 2020).

| Calendar Year 2019 | | | | |
|---|---|---|---|---|
| **Timekeeper** | **Role** | **Historical Rate** | **Hours** | **Value Added** |
| Parsigian, Jeanifer | Associate | $805 | 1010.9 | $813,775 |
| Edmondson, Kerrie | Associate | $540 | 1205.3 | $650,835 |
| Spangler, Cardelle | Partner | $850 | 628.4 | $534,098 |
| Kessler, Jeffrey | Partner | $1,515 | 322.0 | $487,830 |
| Schanowski, Eric | Associate | $540 | 662.4 | $357,696 |
| Tsukerman, Lev | Associate | $570 | 523.9 | $298,623 |
| Feher, David | Partner | $1,245 | 206.5 | $257,093 |
| Sherman, Scott | Associate | $570 | 443.7 | $252,909 |
| Washington, Drew | Associate | $580 | 280.1 | $162,458 |
| Leiden, Diana | Partner | $860 | 183.1 | $157,466 |
| Obi, Shawn | Associate | $805 | 133.3 | $107,307 |
| Metz, Dina | Paralegal | $330 | 294.8 | $97,284 |
| Kyritsopoulos, Corinne | Paralegal | $310 | 250.5 | $77,655 |
| Hampton, Ian | Associate | $755 | 63.3 | $47,792 |
| Markarian, Lara | Associate | $580 | 77.6 | $45,008 |
| Pichardo-Ley, Erika | Paralegal | $160 | 251.3 | $40,208 |
| Bily, Sarah | Associate | $660 | 48.1 | $31,746 |
| Cole, Eva | Partner | $1,070 | 24.8 | $26,536 |
| Ostrander, Benjamin | Associate | $695 | 1.2 | $834 |
| Abing, Carol | Paralegal | $325 | 1.2 | $390 |
| Cruz, Erick | Paralegal | $265 | 0.5 | $133 |
| **Grand Total** | | | **6,612.8** | **$4,447,673** |

7

| Calendar Year 2020 | | | | |
|---|---|---|---|---|
| **Timekeeper** | **Role** | **Historical Rate** | **Hours** | **Value Added** |
| Parsigian, Jeanifer | Associate | $885 | 961.5 | $850,928 |
| Kessler, Jeffrey | Partner | $1,600 | 392.6 | $628,160 |
| Tsukerman, Lev | Associate | $660 | 910.1 | $600,666 |
| Sherman, Scott | Associate | $660 | 801.1 | $528,726 |
| Spangler, Cardelle | Partner | $890 | 566.5 | $504,141 |
| Edmondson, Kerrie | Associate | $610 | 702.6 | $428,586 |
| Leiden, Diana | Partner | $930 | 422.2 | $392,646 |
| Schanowski, Eric | Associate | $590 | 510.2 | $301,018 |
| Feher, David | Partner | $1,315 | 196.0 | $257,740 |
| Washington, Drew | Associate | $580 | 419.0 | $243,020 |
| Bily, Sarah | Associate | $760 | 260.5 | $197,980 |
| Kyritsopoulos, Corinne | Paralegal | $315 | 605.0 | $190,575 |
| Momand, Marjon | Associate | $580 | 290.7 | $168,606 |
| Markarian, Lara | Associate | $580 | 277.9 | $161,182 |
| Obi, Shawn | Associate | $885 | 176.1 | $155,849 |
| Metz, Dina | Paralegal | $335 | 372.9 | $124,922 |
| Pichardo-Ley, Erika | Paralegal | $185 | 496.6 | $91,871 |
| Hudgens, Johanna | Associate | $810 | 86.4 | $69,984 |
| Edwards, Sandra | Partner | $1145 | 38.0 | $43,510 |
| Kellerman, Dillon | Associate | $580 | 21.2 | $12,296 |
| Coberly, Linda | Partner | $1,165 | 8.0 | $9,320 |
| Skridul, Robert | Paralegal | $350 | 2.5 | $875 |
| Ostrander, Benjamin | Associate | $790 | 0.5 | $395 |
| Abing, Carol | Paralegal | $330 | 1.0 | $330 |
| Skogg, Gregory | Paralegal | $350 | .3 | $105 |
| **Grand Total** | | | **8,519.4** | **$5,963,429** |

| Calendar Year 2021 | | | | |
|---|---|---|---|---|
| **Timekeeper** | **Role** | **Historical Rate** | **Hours** | **Value Added** |
| Kessler, Jeffrey | Partner | $1,695 | 135.0 | $228,825 |
| Parsigian, Jeanifer | Partner | $955 | 100.9 | $96,360 |

| Calendar Year 2021 | | | | |
|---|---|---|---|---|
| **Timekeeper** | **Role** | **Historical Rate** | **Hours** | **Value Added** |
| Tsukerman, Lev | Associate | $735 | 112.8 | $82,908 |
| Spangler, Cardelle | Partner | $965 | 83.7 | $80,771 |
| Edmondson, Kerrie | Associate | $660 | 52.0 | $34,320 |
| Feher, David | Partner | $1,315 | 14.3 | $18,805 |
| Sherman, Scott | Associate | $735 | 9.7 | $7,130 |
| Leiden, Diana | Partner | $990 | 5.6 | $5,544 |
| Lemajeur, Shannon | Associate | $580 | 8.2 | $4,756 |
| Kyritsopoulos, Corinne | Paralegal | $325 | 7.2 | $2,340 |
| Washington, Drew | Associate | $610 | 1.7 | $1,037 |
| **Grand Total** | | | **531.1** | **$562,794** |

| Calendar Year 2022 | | | | |
|---|---|---|---|---|
| **Timekeeper** | **Role** | **Historical Rate** | **Hours** | **Value Added** |
| Kessler, Jeffrey | Partner | $1,795 | 51.1 | $91,725 |
| Feher, David | Partner | $1,415 | 42.5 | $60,138 |
| Edmondson, Kerrie | Associate | $810 | 72.7 | $58,887 |
| Parsigian, Jeanifer | Partner | $1,060 | 28.9 | $30,634 |
| Momand, Marjon | Associate | $725 | 40.6 | $29,435 |
| Leiden, Diana | Partner | $1,080 | 26.8 | $28,944 |
| Spangler, Cardelle | Partner | $995 | 27.2 | $27,064 |
| Tsukerman, Lev | Associate | $875 | 17.5 | $15,313 |
| Sherman, Scott | Associate | $875 | 8.3 | $7,263 |
| Wimer, Ruth | Partner | $1,285 | 2.3 | $2,956 |
| Gordon, Amy | Partner | $1,225 | 1.3 | $1,593 |
| DalSanto, Matthew | Of Counsel | $1,050 | 1.3 | $1,365 |
| Kyritsopoulos, Corinne | Paralegal | $340 | 2.9 | $986 |
| **Grand Total** | | | **323.4** | **$356,300** |

28.   Copies of contemporaneously made individual attorney and staff time records, which would require a significant investment of resources to review and redact

9

for attorney-client privileged communications and attorney work product, are available. All of the time submitted was recorded contemporaneously in accordance with the firm's billing system.

29. Winston & Strawn's hourly rates are adjusted annually to comport with the legal marketplace for comparable firms. Winston & Strawn monitors prevailing market rates in the regions where it works, including the Central District of California, taking into account attorneys of comparable skill, experience, and qualification. The firm maintains a number of internal metrics to benchmark its rates relative to those charged by competitor firms. The rates reflected in this application were also the standard billing rates these timekeepers offered for their services for other matters throughout the United States, including in the Central District of California.

30. Winston & Strawn's e-Discovery team invested an additional 1,932.9 hours to assist with discovery efforts (largely reviewing documents to be produced). The value of that time, using the historic hourly billing rates of the firm at the time the services were rendered, is $165,883.

31. Winston & Strawn has excluded from its fee calculations certain timekeepers who worked only limited hours or only for short periods of time, for the sake of being conservative and making sure that any possible inefficiencies are eliminated. The amount of fees excluded on this basis is about $129,549 and covers work performed by practice attorneys, law clerks, and others.

32. Winston & Strawn has also excluded from its lodestar calculation any attorneys' fees incurred after April 6, 2022.

33. The total fees incurred by attorneys (partners, of counsel, and associates), paralegals, and e-Discovery through April 6, 2022 totals $11,496,079 (i.e., $11,330,196 from partners, of counsel, associates, and paralegals plus $165,883 from e-Discovery). This was class counsel's lodestar.

## EXPENSES

34.      During the pendency of this case (through April 5, 2022), Winston & Strawn advanced a range of expenses necessary for the prosecution of this matter, totaling $1,319,127.  A significant portion of these costs (about $756,345) covered necessary expert fees for Plaintiffs' three expert witnesses.  The costs for which Winston & Strawn seeks reimbursement are the types of costs that would be paid by a Winston & Strawn employment or sports litigation client that hires the firm by the hour. Outside of expert fees, Winston & Strawn incurred costs for, among other things: two mediations, computerized legal research, transcripts and court reporters, airfare, lodging, meals, and copying.  Winston & Strawn also incurred a variety of Electronic Discovery Services costs, separate from the review attorney fees discussed above. These Electronic Discovery Services costs covered, among other things: forensic data collection, data extraction from images, forensic analysis, Relativity loading and processing, and custodian filtering.

35.      Below is a chart summarizing these litigation costs.

| Cost Description | Amount |
|---|---|
| Expert, Consultation, and Evaluation Fees | $756,345 |
| Electronic Discovery Services | $195,972 |
| Computerized Legal Research | $64,775 |
| Color Copies | $44,584 |
| Transcript Fees | $44,520 |
| JAMS Mediation Fees | $34,250 |
| Airfare | $31,474 |
| Bracewell Mediation Fees | $30,929 |
| Professional/Consulting Fees | $29,196 |
| Lodging | $15,934 |
| Translation Fees | $13,339 |
| Court Costs and Fees | $11,952 |
| Court Reporter | $11,024 |
| Travel – Long Distance Transportation | $7,329 |
| Business Meals | $6,956 |
| Litigation Support Services | $3,391 |

11

| | |
|---|---|
| Messenger Services | $2,679 |
| Overtime Transportation | $2,257 |
| Business Center Services | $2,044 |
| Document Imaging & OCR | $1,924 |
| Travel – Local Transportation | $1,713 |
| Business Meals – Conference Room Services | $1,263 |
| Air Courier | $808 |
| Overtime Meals | $785 |
| Computer Docket System | $674 |
| Telecommunication Services | $567 |
| Video/Equipment Rental Expense | $515 |
| Postage | $462 |
| Other Travel Expense | $447 |
| Secretarial Overtime | $425 |
| Filing and Other Fees | $400 |
| Copy Center Charges | $59 |
| Document Retrieval | $58 |
| Media Duplication | $45 |
| Publication/Subscription Fees | $20 |
| Certified Copies | $15 |
| **Grand Total** | **$1,319,127** |

36.     Copies of invoices and contemporaneously made records evidencing these costs are available.

37.     Counsel also seeks reimbursement of $50,000 in anticipated settlement administration costs.  This $50,000 in anticipated costs will cover costs for settlement administration over the period in which the four annual settlement payments by USSF will be made and then distributed to class members.

38.     Class counsel seeks to incrementally and proportionately collect its Court-awarded fees as USSF makes its yearly $5.5 million settlement installment payments, after expenses are reimbursed to class counsel out of the first settlement installment.

39.     As of the date of this Declaration, only one class member, Hope Solo, has objected to the pay-claims settlement.  Hope Solo also objected to class counsel's fees and costs request.  *See* Dkt. 325.

1    I declare under penalty of perjury that the foregoing is true and correct.  Executed
2    on this 1st day of November 2022 in New York, New York.

3

4                              */s/ Jeffrey L. Kessler*
                             Jeffrey L. Kessler
5